IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **JONATHAN STANLEY, et al.,**<br>on behalf of themselves and all similarly situated individuals,<br><br>      **Plaintiffs,**<br><br>v.<br><br>**TURNER OIL & GAS PROPERTIES, INC.,**<br><br>      **Defendant.** | Case No. 2:16-cv-386<br><br>Judge Graham<br><br>Magistrate Judge Deavers |

### OPINION & ORDER

  Named plaintiffs Jonathan Stanley and Mary Elliott bring this action against Turner Oil & Gas Properties, Inc. ("Turner") as authorized by the Fair Labor Standards Act of 1938 (the "FLSA"). 29 U.S.C. §§ 201–219 (as amended). Stanley and Elliott bring this action against Turner on behalf of themselves and all similarly situated individuals (collectively, "Plaintiffs" or "the Landmen"). Landmen are individuals who perform title searches on parcels of real property. The Landmen assert that they regularly worked more than 40 hours a week without Turner paying them overtime wages (1.5 times their normal rate). Pending before the Court is "Plaintiffs' Motion for Conditional Collective Action Certification, Expedited Discovery, and Court-Supervised Notice to Potential Opt-In Plaintiffs." (Doc. 13). For the reasons discussed below, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' motion.

I) Factual Background

  The evidence the parties present at this stage comes from declarations made under penalty of perjury, documents relating to Turner's hiring of the Landmen, and various emails involving Turner employees and contractors, including the Landmen.

  Turner "is an Oklahoma corporation that provides pre-drilling services to oil and gas drillers, including representing its clients in mineral leasing." (Boone Ellis Decl. at ¶ 2, Doc. 17-

1). In its mineral-leasing work, Turner uses Landmen "to retrieve real property documents from various sources . . . to determine ownership, leasehold, or other relevant interest in the particular parcel, including, but not limited to, whether there was an obtainable interest in the parcel, whether the parcel had any restrictions or encumbrances, etc." (Ellis Decl. at ¶ 4).

The named Plaintiffs—Jonathan Stanley and Mary Elliott—worked for Turner as Landmen. Stanley and Elliott assert they are representative of all Turner Landmen, and that Turner misclassified all Landmen as independent contractors rather than employees, the result of which was Turner "suffering or permitting each to work overtime without being paid at the [overtime rate]." (Pls.' First Am. Compl. at ¶ 1, Doc. 3). Six former Turner Landmen have opted-in so far.

In support of its argument against conditional certification, Turner submits the affidavit of Boone Ellis, the General Manager of Turner. (Ellis Decl. at ¶ 1). Turner refers to the Landmen as independent contractors. Turner claims that "[i]t has been standard practice in the oil and gas industry that Landmen work . . . as independent contractors, and, in return, are paid under the day rate method." (Ellis Decl. at ¶ 5). Turner provided the Landmen with some of the trappings of independent contractors, for example an agreement executed by each Landman stating they were not employees, but independent contractors, (Ex. 1 to Ellis Decl. at § 3, Doc. 17-1); and an "Affidavit of Exempt Status Under the Workers' Compensation Act," in which each Landman agreed, among other things, that "I am an independent contractor, not an employee of the contractor. I do not want workers' compensation insurance and understand that I am not eligible for Workers' Compensation benefits," (Ex. 3 to Ellis Decl. at ¶ 4). Landmen were to fill out this affidavit after reviewing an "Exempt Status Fact Sheet," which is essentially a list of statements and questions to help the answering individual determine whether they are an independent contractor or an employee. (Ex. 2 to Ellis Decl.).

Turner points to other indicia that the Landmen were independent contractors. The Landmen provided their own automobiles, digital cameras, laptops, mobile phones, email accounts, and navigation tools. (Ellis Decl. at ¶ 14). Turner or its clients leased various office spaces in which the Landmen could work, and gave the Landmen access to the facilities from 8:00 a.m. to 5:00 p.m. on weekdays. (Ellis Decl. at ¶ 15). Turner charged the Landmen $25[1] a month for office supplies, which included access to high speed internet and printers. (Ellis Decl. at ¶ 15). Turner supervised the Landmen, but Turner asserts that its supervision was limited to the

---

[1] Or $20.00, according to the Landmen. (*See* Stanley Decl. at ¶ 48).

extent that it attempted to "ensure their final product reflected a full and complete title for the property at issue in each project." (Ellis Decl. at ¶ 24).

Because of the unique nature of Turner's clients' needs in Ohio, Turner worked somewhat differently with its Landmen in Ohio. For example, Turner hired a digital imaging company to "electronically image two Ohio county courthouses' real property records for easier access and use by the Ohio contract Landmen." (Ellis Decl. at ¶ 16). Turner reimbursed its Landmen in Ohio for housing expenses, something it did not do for Landmen working outside of Ohio. (Ellis Decl. at ¶ 17). Furthermore, Turner, and in turn, the Landmen, worked primarily for two clients in Ohio, one on a multi-year project "as opposed to a few-month project, which was the type of project work Turner provided to clients outside Ohio." (Ellis Decl. at ¶ 11).

The Landmen were well-paid. For example, Stanley earned approximately $137,000 and $119,000 in the two full years he worked as a Landman. (Ellis Decl. at ¶ 18). Elliott earned approximately $121,000 and $115,000 in her two full years of employment. (Ellis Decl. at ¶ 19). The opt-in plaintiffs were similarly well-compensated. (See Ellis Decl. at ¶ 20).

Turner did not keep any employment records for the Landmen. (Ellis Decl. at ¶ 21). Turner never "fine[d], discipline[d], or terminate[d] Plaintiffs or any other contract Landmen for failing to attend any meetings or come into the office space Turner allowed Landmen to use." (Ellis Decl. at ¶ 21). Turner did not prohibit the Landmen from engaging in outside employment. (Ellis Decl. at ¶ 22). Turner did not provide the Landmen with any fringe benefits, such as holiday pay, as it would with its employees. (Ellis Decl. at ¶ 23). Turner provided each Landman with a Form W-9 and made each Landman "responsible for withholding their own taxes." (Ellis Decl. at ¶ 25). Turner eventually required all Landmen to establish their own businesses through which they would be employed and paid. (Ellis Decl. at ¶ 26).

While Plaintiffs don't dispute any of the facts presented by Turner, they do highlight other facets of their work as Landmen. In support of their Motion, the Landmen provide declarations from the Landmen, along with supporting documentation, such as emails giving instructions from Turner.

Turner required Landmen to use pre-formatted forms to input information regarding each property. (Answer to Am. Compl. at ¶ 47, Doc. 6). One Landman, who it appears was operating in a supervisory or quality-control role for Turner, supplied the Landmen with checklists for completed reports. (Ex. A to Barber Decl., Doc. 13-5 at 55). While Turner typically hired law

3

graduates or lawyers, (Ellis Decl. at ¶ 12), Landmen did not need to have a law degree nor any other advanced training, (Stanley Decl. at ¶ 6–8, Doc. 13-2). Because most of their work required collecting data and entering it into forms, the Landmen describe their work as "largely mechanical in nature." (Pls.' Mot. at 4).

Turner asserts that its Landmen all filled out forms indicating they agreed they were independent contractors after reviewing the Exempt Status Fact Sheets, which included questions like, "Do you create plans or specifications for the job?", "Do you exercise control over most of the details of the work?", and "Do you set your own work hours?" (*See* Ex. 2 to Ellis Decl. at ¶ 2). But Plaintiffs assert that when they filled out these forms, "other than the fact that I would be researching land titles I did not know what my job duties with Turner were going to be or how I would be required to carry them out." (Stanley Decl. at ¶ 11; *see also* Elliott Decl. at ¶¶ 9–11).

Turner asserts that its "only responsibility over Plaintiffs' and the other contract Landmens' [sic] work was to ensure their final product reflected a full and complete title for the property at issue in each project." (Ellis Decl. at ¶ 24). But Plaintiffs assert that Turner exercised considerable control over their work. Turner assigned projects to Landmen, provided the exact manner in which Landmen were to complete those projects, assigned an amount of time to each project in which the assigned Landman was expected to complete it, required Landmen to request another project if they finished one early, if a Landman was sick, he or she would need to call their "Team Lead" and inform them of the reason for the absence. (*See* Stanley Decl. at ¶¶ 20–21, 25, 31). The Landmen operated with the understanding that if they did not work the days assigned, they would no longer be employed by Turner. (Barber Decl. at ¶ 8, Doc. 13-5). Landmen wanting to take vacation had to "fill out a vacation request form in advance." (Stanley Decl. at ¶ 32). Turner required Landmen to be in the office from 8:00 a.m. until 5:00 p.m. with one hour for lunch. (Stanley Decl. at ¶ 33). If a Landman wasn't in the office, they were expected to notify their "Team Lead" of where they were and what they were doing. (Stanley Decl. at ¶ 34). At one point, the Landmen were required to sign in and out at the Turner-provided office facility, noting their time of arrival and departure. (Stanley Decl. at ¶ 36). Turner required—as is evidenced by the title of the email, "Mandatory Meeting"—Landmen to attend various meetings. (*See* Ex. A to Elliott Decl. at 13).

Each Landman asserts they frequently worked over 40 hours for Turner per week, but were never paid overtime. (Stanley Decl. at ¶ 30; Foote Decl. at ¶ 12, Doc. 13-3; Elliott Decl. at

4

¶ 29; Barber Decl. at ¶ 19; Ramach Decl. at ¶ 20, Doc. 13-6). This was not because Turner required the Landmen to stay at the office for more than eight hours, it was due to Turner's day-rate assignment system.

> Here's how the day-rate assignment system worked:
>
> Turner would assign every project a certain amount of in [sic] which I was expected to complete a project.
>
> Generally, the pre-approved days were an accurate estimation of the amount of work I would need to do to complete a project. In the event that a project was finished early, I was required to request another project from Turner. When I did this, I would be always be [sic] assigned another project and was expected to begin working on it. If this happened, I would only be paid for the time I spent actually working on a project, not for the time the project was approved for.
>
> Although it was very rare, there were times when I was unable to complete a project within the assigned amount of days. If that happened, I was required to go to my Team Lead and explain the difficulties of a project and why I needed more time. In my experience, my requests for more time would be approved and I would always be paid my normal rate for the extra time I needed to complete a project.
>
> When I worked at Turner, I would be assigned to work on a project on particular days of the week. For example, a project with three approved days might be assigned on a Monday, Tuesday, and Wednesday of a particular week.
>
> I was generally assigned at least five project-days during a particular week, with the exception of weeks in which certain holidays fell. In holiday weeks in which I was assigned less than 5 days of work, I would only be paid for the days or parts of days I actually worked.
>
> Turner would frequently assign me to work six or seven project days within a given week, and I was required to work the sixth and/or seventh day on the date designated by Turner. I would be paid for the extra days at my normal rate.

(Stanley Decl. at ¶¶ 24–29) (paragraph numbers omitted). When Turner would assign extra project days, it would do so by emailing various Landmen:

> As you are aware, we are quickly approaching our deadline of September 12th (7 days from now) to have all title completed and reviewed on the OS Project. I know everyone has been working diligently, but we must ask that you redouble your efforts. We have been granted 7 day billing and ask that you use it. This means nights and weekends.

5

(Ex. A to Elliot Decl. at 10, Email from Roger Akeman).[2] The Landmen suggest that due to Turner's hiring and project-assignment process, Landmen did not perform similar work for other companies, nor did they do so even when they stopped working for Turner. (Foote Decl. at ¶ 13).

The Landmen assert that from what they observed from working alongside other Landmen, each Landman performed identical, or very similar, work. (Stanley Decl. at ¶ 49).

**II) Discussion**

Plaintiffs' Motion raises three topics for discussion: (1) whether to conditionally certify the collective action; (2) if certified, whether to limit the collective class, and thus limit notice of the action; and (3) whether to expedite discovery.

### A) Conditional Certification

Plaintiffs move for conditional certification of the following collective class:

> All current and former Petroleum Land Managers or individuals in a Landman position who worked for Turner at any location in the United States and, at any time during the period three years before each opts-in this action, were suffered or permitted to work more than 40 hours in a given workweek and not compensated at a rate of one-and-one-half times regular hourly pay for hours worked in excess of 40.

(Pls.' Am. Compl. at ¶ 112). Since collective actions find their root in section 216(b) of the FLSA, the Court starts there. Section 216 of the FLSA provides a private right of action to employees affected by their employer's violations of the FLSA's substantive protections, such as minimum wage and overtime rules:

> Any employer who violates the provisions of . . . section 207 of this title shall be liable to the employee or employees affected in the amount of their . . . unpaid overtime compensation . . . and in an additional equal amount as liquidated damages. . . . An action to recover the liability prescribed [above] may be maintained against any employer . . . in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees *similarly situated*. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b) (emphasis added). The Court may authorize notice to similarly situated employees to permit them to opt into the lawsuit. *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544,

---

[2] Roger Akeman is a self-described "Lead Crew Chief" for Turner. And while he may not be a formal Turner employee, the emails show he directs the work of the Landmen with directions from Turner.

546 (6th Cir. 2006).[3] But before the Court can authorize this notice to potential opt-in plaintiffs, it "must first consider whether plaintiffs have shown that the employees to be notified, are, in fact, 'similarly situated.'" *Id.*

Courts typically employ a "two-phase inquiry to address [the] question" of whether proposed opt-in plaintiffs are similarly situated to the named plaintiffs. *Id.* The first stage is the "notice" stage at which the Court, with the benefit of little or no discovery, determines whether the named plaintiffs are similarly situated to the putative opt-in plaintiffs they seek to notify of the lawsuit. Only later, after the close of discovery and the Court's receipt of all the opt-in forms, will the Court need to "examine more closely the question of whether particular members of the class are, in fact, similarly situated." *Id.* at 547.

Here, the Court is concerned with the first stage of the process. "The lead plaintiffs bear the burden of showing that the opt-in plaintiffs are similarly situated to the lead plaintiffs." *Wlotkowski v. Mich. Bell Tel. Co.*, 267 F.R.D. 213, 217 (E.D. Mich. 2010). "[C]ontrolling Sixth Circuit law sets a modest bar of proof at this stage of litigation." *Crescenzo v. O-Tex Pumping, LLC*, No. 15-CV-2851, 2016 WL 3277226, at *4 (S.D. Ohio June 15, 2016) (citing *Comer*, 454 F.3d at 547). At this stage, the Court typically has "minimal evidence," so it analyzes the similarly-situated question "using a fairly lenient standard." *Swigart v. Fifth Third Bank*, 276 F.R.D. 210, 213 (S.D. Ohio 2011) (citing *White v. MPW Indus. Servs., Inc.*, 236 F.R.D. 363, 366 (E.D. Tenn. 2006)); *see also Comer*, 454 F.3d at 547 ("[A]uthorization of notice 'need only be based on a modest factual showing.'") (quoting *Pritchard v. Dent Wizard Int'l Corp.*, 210 F.R.D. 591, 595 (S.D. Ohio 2002). The notice stage only requires that Plaintiffs "submit evidence establishing at least a colorable basis for their claim that a class of 'similarly situated' plaintiffs exists." *Olivo v. GMAC Mortg. Corp.*, 374 F. Supp. 2d 545, 548 (E.D. Mich. 2004) (quoting *Severtson v. Phillips Beverage Co.*, 137 F.R.D. 264, 267 (D. Minn. 1991)); *see also Wlotkowski*, 267 F.R.D. at 217.

There is some authority in the Sixth Circuit for an enhanced standard of proof when some discovery has taken place.[4] In some cases, courts "require Plaintiffs to make a modest 'plus' factual showing that there is a group of potentially similarly situated plaintiffs that may be discovered by sending opt-in notices." *Creely v. HCR ManorCare, Inc.*, 789 F. Supp. 2d 819, 826 (N.D.

---

[3] In *Comer*, the Sixth Circuit spilled considerable ink discussing the standards for conditional class certification; however, ultimately the court held that it lacked jurisdiction to hear the appeal of the district court's "conditional order approving notice to prospective co-plaintiffs in a suit under § 216(b)." *Id.* at 549.

[4] Turner doesn't argue for an enhanced factual showing; it only observes that the modest factual showing still requires some showing of facts. (Def.'s Resp. at 13, Doc. 17).

Ohio 2011); *accord Byers v. Care Transp., Inc.*, No. 13-CV-15174, 2016 WL 4771328, at *3 (E.D. Mich. Sept. 14, 2016) (deciding motion under "modest plus" standard, but only after "fifteen months of discovery and after dispositive motions were filed and decided"); *but see Lacy v. Reddy Elec. Co.*, No. 3:11-CV-52, 2011 WL 6149842, at *3–4 (S.D. Ohio Dec. 9, 2011) ("[T]here has been no *joint* discovery on the certification issue. . . . Under these circumstances, the heightened standard for conditional certification, as set forth in *Creely*, is simply inapplicable.") (emphasis original). In *Creely*, "Plaintiffs deposed a number of Defendants' executives and corporate managers in an attempt to show" the existence of a group of similarly situated potential opt-in plaintiffs. 789 F. Supp. 2d at 822. The "modest-plus" standard typically applies when the parties have conducted some joint discovery prior to the plaintiffs' motion for conditional certification.

Here, while the parties both submitted declarations and supporting documents, none of it is the product of joint discovery, the distinction noted in *Lacy*. *Id.* at *3. Unlike in *Creely*, here the parties took no depositions before Plaintiffs filed their Motion for Conditional Certification. And like in *Lacy*, the parties have exchanged no joint discovery on the certification issue. Therefore, the "modest factual showing" standard applies to the Landmen's Motion. The Court also notes that the parties don't discuss this issue in the briefs, and Turner appears to accept that only a "modest factual showing" is required. (Def.'s Resp. at 13, Doc. 17). Here it makes sense to apply a more lenient standard, and the available evidence shows why that's the case. Several of the Landmen's declarations state that they observed the work of other Landmen and their work all appeared to be virtually identical, and their pay and contractor status also appeared identical. (*See, e.g.*, Stanley Decl. at ¶¶ 49–53). Of course, with the benefit of joint discovery, the Landmen will presumably have access to records that will show whether Stanley's observations are consistent with other Landmen whom he did not observe. Therefore, the Court applies the "fairly lenient standard." To certify Plaintiffs' collective action, the Court only requires a modest factual showing that Plaintiffs are similarly situated to the putative opt-in plaintiffs.

What does it mean to be similarly situated? Let's begin with what is clear: "plaintiffs are similarly situated when they suffer from a single, FLSA—violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs." *O'Brien v. Ed Donnelly Enterprises, Inc.*, 575 F.3d 567, 585 (6th Cir. 2009) *abrogated by Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016). But that's only the most obvious situation.

8

"Plaintiffs can show they are similarly situated by showing that 'their claims [are] unified by common theories of defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct.'" *Swigart v. Fifth Third Bank*, 276 F.R.D. 210, 213 (S.D. Ohio 2011) (quoting dicta from *O'Brien*, 575 F.3d at 585). Plaintiffs can be similarly situated where they articulate "common means by which they were allegedly cheated[, like] forcing employees to work off the clock." *O'Brien*, 575 F.3d at 585. Courts typically look at the following issues: (1) were all the plaintiffs subject to the same employment classification, (2) were none of the plaintiffs paid overtime, (3) did all of the plaintiffs have the same or similar job duties, (4) did the plaintiffs share the same job title. *Swigart*, 276 F.R.D. at 213; *Wlotkowski*, 267 F.R.D. at 218.

Here is, by way of reminder, the collective class that Plaintiffs seek to notify of this lawsuit:

> All current and former Petroleum Land Managers or individuals in a Landman position who worked for Turner at any location in the United States and, at any time during the period three years before each opts-in this action, were suffered or permitted to work more than 40 hours in a given workweek and not compensated at a rate of one-and-one-half times regular hourly pay for hours worked in excess of 40.

(Pls.' Am. Compl. at ¶ 112). Plaintiffs provide ample evidence that all of the Landmen had the exact same job title, the exact, or nearly exactly the same job description, they were all classified as independent contractors, they were all paid by the day-rate method, and none of the Landmen were paid at the overtime rate when they worked more than 40 hours per week. Therefore, the Landmen appear similarly situated.

Furthermore, the Landmen were all subject to the same allegedly FLSA-violating scheme. Plaintiffs allege that Turner misclassified them as independent contractors to avoid paying them overtime. Turner paid the Landmen through its day-rate system, but it sometimes assigned the Landmen more than five days' worth of work in a given week. However, even on these weeks, Turner didn't pay the Landmen overtime. It would have had to pay the Landmen overtime if they were employees.

Plaintiffs allege they should have been classified as employees, and they provide some evidence indicating as much. For example, Plaintiffs assert that Turner controlled when they worked, how much they worked, Turner assigned them work, Turner directed them to be in the office for face time with "the client," and none of the Landmen did work for any company other than Turner.

9

Defendants make several arguments opposing the proposed collective action generally and then two arguments about the specific contours of the proposed collective action. The Court covers the general objections first and then moves to the two specific objections.

Turner makes numerous arguments about the merits of the Landmen's claims, such as debating whether the Landmen were ever required to work more than 40 hours per week. (*See* Def.'s Resp. at 24). However, "[i]t is not the role of the Court at this stage of the proceedings to decide the case on the merits." *Jimenez v. Lakeside Pic-N-Pac, L.L.C.*, 1:06-CV-456, 2007 WL 4454295, at *3 (W.D. Mich. Dec. 14, 2007); *see also Creely*, 789 F. Supp. 2d at 826; *MPW Indus. Servs.*, 236 F.R.D. at 368. At this stage, the Court does not "resolve factual disputes, make credibility determinations, or decide substantive issues." *Swigart*, 276 F.R.D. at 214. Turner's three global objections to conditional certification go to the merits of the Landmen's claim.

First, Turner argues that the FLSA was not designed to protect individuals like the Landmen who, in some cases, earned over $100,000 per year. This goes to the merits of the Landmen's claim because Turner argues that the Landmen should be exempt from the FLSA's protections. The Department of Labor regulation in effect at the time exempted from FLSA protection "employee[s] with total annual compensation of at least $100,000 . . . if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee." Highly Compensated Employees, 29 C.F.R. § 541.601 (effective until Dec. 1, 2016). But this would call for a decision on the substantive issue of whether the Landmen qualify as exempt employees under any of the three aforementioned exceptions. Turner, however, bases its argument not on the regulations but on a Supreme Court case: *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156 (2012).

In *Christopher*, the Court held that certain pharmaceutical sales representatives qualified as outside salesmen exempt from the FLSA's minimum wage and overtime requirements. *Id.* at 2174. Turner argues that it also means that employees who make more than $70,000 per year are "not the type of 'oppressed' worker covered by the FLSA." (Def.'s Resp. at 12). But *Christopher* analyzed a specific exemption—outside salesmen—and the Court referenced high salaries to illustrate how the plaintiffs didn't qualify for the outside-salesman exemption, not because the Court was imposing a strict income cap on the applicability of the FLSA. *See id.* at 2173. As previously discussed, the FLSA does have an income cap, but an income over the cap must be paired with an exemption for an employee to be exempt from FLSA coverage under the Highly

10

Compensated Employees regulation. In short, this is a substantive issue that does not impact the analysis the Court performs here.

Second, Turner argues that its classification of the Landmen as independent contractors does not violate the FLSA, and therefore the Court should not conditionally certify the class. Turner cites this language in support: "courts consistently require plaintiffs to show that they and potential plaintiffs together were victims of a common policy or plan that violated the law before certifying a collective action." *Heaps v. Safelite Sols., LLC*, No. 2:10-CV-729, 2011 WL 1325207, at *3 (S.D. Ohio Apr. 5, 2011). Turner latches onto the "plan that violated the law" part of the above language to argue, essentially, that the Landmen have to prove a violation of the law at the conditional-certification stage. But as Judge Frost made clear in *Heaps*, the argument that a specific policy is lawful or unlawful "relates to the merits of th[e] action and is not the relevant inquiry at this stage of the proceedings." *Id.* at *4. To the extent this argument goes to the substance of the Landmen's claims, the Court won't address it now. *See Redmond v. NPC Int'l, Inc.*, No. 13-1037, 2016 WL 7223468, at *4 (W.D. Tenn. Dec. 13, 2016) (refusing to address defendant's substantive argument that its company-wide policies complied with the FLSA).

Third, Turner argues that there is no evidence that any of the Landmen worked more than 40 hours in any week. But the Landmen state that they did sometimes work more than 40 hours per week, (*See, e.g.*, Stanley Decl. at ¶¶ 29–30), did so at Turner's direction, (Elliott Decl. at ¶ 28), and the opt-in plaintiffs all declare that they too worked more than 40 hours per week under the same assignment system. Turner disputes these facts by arguing that the schedule it maintained for the Landmen prevented them from working more than 40 hours per week and that the Landmen's own declarations state that they could not have worked more than 40 hours per week. This is exactly the type of factual dispute that the Court should not resolve at this stage of the litigation, so the Court won't resolve it now. The Landmen have established a colorable claim that the named plaintiffs are similarly situated to other Turner Landmen.

In short, little of Turner's arguments regarding the merits of the Landmen's claims bears on this Court's analysis of whether Plaintiffs' opt-in description describes individuals similarly situated to the named plaintiffs. As the Court in *Swigart* noted, "while [Turner's] asserted defense[s] may be compelling, the Court finds it inappropriate to engage in a merits analysis at this stage of the lawsuit." 276 F.R.D. at 214. The Court will certify this collective action, but Turner argues that the Court should limit the extent of the certification.

### B) Limiting notice of the collective action

Turner argues that Plaintiffs' proposed notice should be limited in two ways. "First, the notice should be limited to only Landmen who performed contract services for Turner in Ohio, as argued more fully above. (Def.'s Resp. at 27). Second, it should be limited to contract Landmen who performed contract Landmen services for Turner in Ohio from the date two years before the Court's Order granting Plaintiffs' Motion." (Def.'s Resp. at 29).

#### 1) The Court will limit the collective action to Ohio and Kentucky Landmen

The Court will conditionally certify this collective action and approve notice to all Turner Landmen that worked for Turner in Ohio or Kentucky. The standard requires only modest proof at the notice stage; here, the Landmen have provided only one specific piece of evidence about the operation of Landmen outside of Ohio. Specifically, opt-in Plaintiff Mark Ramach states that he, "along with several other Landmen," worked for Turner in Lawrence and Boyd, Kentucky for 3-4 months. (Ramach Decl. at ¶ 24). Ramach states that he performed his duties as a Turner Landman in Kentucky "in a similar fashion to the way I performed them in Ohio, including the way in which my work was assigned." (*Id.*). Ramach also declared that, due to Turner's method of assigning work, and frequent calls and emails after work hours, he too would frequently work in excess of 40 hours in a week without receiving overtime pay. (*Id.* at ¶ 19–21).

Turner's own evidence tends to support Plaintiffs' argument that its Landmen nationwide are similarly situated to the named Plaintiffs. Turner's own declaration states that, "It has been standard practice in the oil and gas industry that Landmen work on a contract basis, are independent contractors, and, in return, are paid under the day rate method. Turner has not deviated from this practice with Landmen, including the Plaintiffs and the other putative class members." (Ellis Decl. at ¶ 5). The "putative class members" to which Ellis refers include "individuals in a Landman position who worked for Turner at any location in the United States." (Pls.' Am. Compl. at ¶ 112). The Landmen also ask the Court to infer uniformity among Turner's Landmen nationwide based on an inference: Turner's Independent Contractor agreements make no reference to any particular state, implying that Turner uses them nationwide. (Pls.' Reply at 3, Doc. 18).

Turner appears to have treated all of its Landmen similarly. However, Plaintiffs provide no evidence that any Landmen outside of those who worked in Ohio or Kentucky were ever required to work more than 40 hours in any week. Without this, the Landmen's alleged FLSA vio-

lation is supported by modest proof in Ohio and Kentucky, but there is no evidence that Turner Landmen suffered FLSA violations nationwide. Ramach worked in Kentucky in an almost identical capacity as a Landman, but that only establishes that Landmen who worked in Kentucky are likely similarly situated to the named Landmen. While Turner's own Ellis Declaration does tend to support the claim that the Landman position did not vary much state-to-state, it does not show that all Turner Landmen worked more than 40 hours per week. The Landmen present no specific evidence that any Landmen outside of those who worked in Ohio and Kentucky ever worked more than 40 hours a week. The Court shares Turner's desire to "avoid the 'stirring up' of litigation through unwarranted solicitation." *Severtson v. Phillips Beverage Co.*, 137 F.R.D. 264, 267 (D. Minn. 1991). Soliciting Landmen nationwide would be unwarranted because Plaintiffs present no evidence that they too suffered an FLSA violation. Therefore, the named plaintiffs are not similarly situated to Turner Landmen nationwide. If Turner Landmen in Oklahoma feel aggrieved, they can sue Turner too.

### 2) The Court will apply the three-year lookback period for willful violations

Turner's final argument is that the Court should apply a two-year statute of limitations to this action. A two year statute of limitations applies to actions brought under the FLSA; however, if the action arises out of a willful violation, a three-year limitations period applies. 29 U.S.C. § 255(a).

Turner argues that the Court should limit its certification of the collective action to the two-year limitations period because the Landmen haven't provided any evidence that demonstrates Turner willfully violated the FLSA. Turner argues that its independent contractor agreement with the Landmen evidences its specific intent to comply with the FLSA, not violate it.

A "willful" violation of the FLSA occurs when "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988) (citing the standard for "willful" adopted in *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 127 (1985) (analyzing the Age Discrimination in Employment Act). Here's another example of why the Court should only require a modest showing at this stage: what could Plaintiffs produce that would tend to show willfulness at this stage other than what they have, which is Turner's well-organized plan to label its Landmen as independent contractors. If the Landmen are employees, then Turner could be found to have willfully violated the FLSA. At the notice stage, this is enough evidence to use the three-year limita-

tions period for willful violations. *Accord White v. Osmose, Inc.*, 204 F. Supp. 2d 1309, 1318 n.9 (M.D. Ala. 2002) (finding that the argument is better suited for a motion for decertification or summary judgment).

### C) Expedited Discovery

The Landmen move for expedited discovery to "enable discovery of the names and addresses of the putative collective class members." (Pls.' Mot. at 29). Turner argues that this point is moot now because formal discovery could commence after the parties held their preliminary pre-trial conference on August 25, 2016. (Def.'s Resp. at 2 n.1). While the Court agrees with Turner that there is now no need for a court order on the subject, the parties are encouraged to expedite the discovery of the identities of and contact information for the current and former Landmen to receive notice.

### III) Conclusion

The Court conditionally certifies this collective action and authorizes notice to all Landmen who performed services for Turner in Ohio or Kentucky at any time during the past three years. Plaintiffs' Motion, therefore, is **GRANTED IN PART AND DENIED IN PART**. (Doc. 13).

IT IS SO ORDERED.

                                                                   s/ James L. Graham  
                                                                  JAMES L. GRAHAM  
                                                                  United States District Judge

DATE: January 13, 2017